UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal No. 08-220 (EGS) |
| : | Violation: |
| v. : | 18 U.S.C. § 1012 (False Statement to Department of Housing and Urban Development) |
| TEMIKA GANAE GUSTUS, : | |
| Defendant. : | |

FILED
AUG - 4 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## STATEMENT OF THE OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, defendant TEMIKA GANAE GUSTUS (hereinafter "GUSTUS") agrees and stipulates as follows:

At times material to this Statement of the Offense:

1. GUSTUS lived in District Heights and Capitol Heights, Maryland. Beginning in or about 1999, GUSTUS was employed in the Office of Tax and Revenue (hereinafter "OTR"), part of the Office of the Chief Financial Officer for the District of Columbia.

2. ALETHIA OLIVIA GROOMS (hereinafter "GROOMS") lived in Washington, D.C., and Clinton, Maryland. GROOMS was a registered real estate agent. In or about 2004, GROOMS founded a company called Awesome Graphic Designs. As part of her graphics design business, GROOMS possessed a scanner and other equipment that she used to scan and manipulate original documents.

3. HARRIETTE MONICA WALTERS (hereinafter "WALTERS") lived in Washington, D.C. From in or about 2001 to in or about 2007, WALTERS was the manager of OTR's Real Property Tax Administration Adjustments Unit.

4. GUSTUS had a personal relationship with WALTERS. WALTERS gave substantial amounts of money to GUSTUS. WALTERS also took GUSTUS on shopping trips and paid for expensive clothing for GUSTUS.

5. In or about the summer of 2006, GROOMS was the real estate agent for GUSTUS's purchase of a house in Capitol Heights, Maryland. GUSTUS met GROOMS through WALTERS and one of GUSTUS's relatives. At one point during the process, GUSTUS told GROOMS that GUSTUS wanted her monthly payments to be between $2,000 and $2,500.

6. The sales price of GUSTUS's house was $270,000. GUSTUS applied for and obtained a HUD/Federal Housing Administration (hereinafter "FHA") loan in the amount of $265,828 from 1st Chesapeake Home Mortgage, LLC, of Annapolis, Maryland (hereinafter "1st Chesapeake"). The note rate was 6.375% for a term of 360 months. The HUD/FHA case no. was xxx-xxx9514.

7. The settlement occurred on or about August 4, 2006, in Maryland. The settlement company for GUSTUS's real estate transaction was Northstar Settlements, LLC. On or about August 4, 2006, GUSTUS tendered Bank of America cashier's check no. 214503, dated that same day, in the amount of $18,000 to Northstar Settlements, LLC. That check only listed GUSTUS as the remitter. In fact, the source of the cashier's check was an $18,000 personal check from WALTERS.

8. Also, on or about August 4, 2006, GUSTUS submitted a Uniform Residential Loan Application and a HUD/VA Addendum to Uniform Residential Loan Application, both dated August 4, 2006, to 1st Chesapeake. Because GUSTUS was obtaining a HUD/FHA loan, GUSTUS knew that these documents, along with supporting materials, would be sent to HUD. GUSTUS initialed or signed each page of the loan application and signed the addendum. In particular, GUSTUS signed the Acknowledgement and Agreement section of the loan application, which stated in relevant part:

> Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq. * * * (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to the closing of the Loan[.]

GUSTUS also signed the Borrower Certification section of the addendum, which stated in relevant part:

> (5) All information in this application is given for the purpose of obtaining a loan to be insured under the National Housing Act or guaranteed by the Department of Veterans Affairs and the information in the Uniform Residential Loan Application and this Addendum is true and complete to the best of my knowledge and belief. Verification may be obtained from any source named herein.

Next to GUSTUS's signature on the addendum were the following notifications:

> Do not sign[ ]unless this application is fully completed. Read the certifications carefully & review accuracy of this application. * * * Federal statutes provide severe penalties for any fraud, intentional misrepresentation, or criminal connivance or conspiracy purposed to influence the issuance of any guaranty or insurance by the VA Secretary or the HUD/FHA Commissioner.

Furthermore, as part of the settlement, on or about August 4, 2006, GUSTUS signed a form titled, "Important Notice to Homebuyers," from HUD. That form expressly stated:

> Don't Commit Loan Fraud * * * Do not falsify information about your income or assets. * * * Do not provide false letters-of-credit, cash-on-hand statements, gift letters or sweat equity letters. * * * Do not accept funds to be used for your down payment from any other party (seller, real estate salesperson, builder, etc.).

9. On page two of her loan application, GUSTUS listed "Carpet Discounter" of Suitland, Maryland, as one of her employers. GUSTUS represented that she was a bookkeeper with Carpet Discounter and that she worked there from August 1, 2003, to present. To support her claim of supplemental employment, GUSTUS provided her lender with four documents in GUSTUS's name purporting to be from Carpet Discounter:

| Document | Purported Date (In or About) | Purported Amount |
| --- | --- | --- |
| Pay Stub | June 25, 2006, to July 8, 2006 | $982.64 in current salary |
| Pay Stub | June 4, 2006, to June 24, 2006 | $982.64 in current salary |
| W-2 | 2005 | $23,944.62 in wages, tips, or other compensation |
| W-2 | 2004 | $21,650.38 in wages, tips, or other compensation |

10. In fact, GUSTUS never worked at, nor received a salary from, Carpet Discounter. The four documents referenced in the preceding Paragraph were forged by GROOMS. Using her graphics design and computer skills, GROOMS created fake pay stubs and W-2 forms for GUSTUS so that GUSTUS could report a second income on her loan application.

11. GUSTUS and GROOMS also conspired to inflate the balance of GUSTUS's credit union share account. On page three of her loan application, GUSTUS represented that she had an account with the "District Government" that had a cash or market value of $22,148. GUSTUS

provided a document purporting to be a statement from the District Government Employees Federal Credit Union (hereinafter "DGEFCU") for her share account no. xxx8401 for the period of June 1, 2006, through June 30, 2006. That account statement showed an ending balance of $22,148.81.

12. Although GUSTUS did hold a share account at the DGEFCU, the actual balance of account no. xxx8401 on June 30, 2006, was $2,108.81, approximately $20,000 less than what GUSTUS claimed in her loan application. To perpetuate this fraudulent act, GUSTUS gave GROOMS a copy of her real DGEFCU statement for June 2006. Using a scanner and a computer, GROOMS edited that credit union statement to overvalue GUSTUS's account by approximately $20,000. GROOMS even increased a 1.01% dividend credit on the June 2006 statement from $1.75 to $21.75 to keep it in proportion with the fake inflated balance. GUSTUS included a copy of the forged account statement in her loan application.

13. GROOMS created the fraudulent DGEFCU statement to help GUSTUS hide the source of $18,000 from WALTERS by making it appear that those funds originated from GUSTUS's credit union share account. In fact, WALTERS had secretly contributed that money to GUSTUS's home purchase. Handwritten notes by the underwriter on the HUD Mortgage Credit Analysis Worksheet stated, "All funds for down payment [and] closing are her own," indicating that this fraudulent conduct was material to the approval of GUSTUS's loan application.

14. GUSTUS's Uniform Residential Loan Application and HUD/VA Addendum to Uniform Residential Loan Application, which contained the false statements, were sent to and received by HUD after the settlement.

## DEFENDANT'S ACCEPTANCE

I have read every word of this six-page Statement of the Offense. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, and after consulting with my attorney, I agree and stipulate to this Statement of the Offense.

Date: 7.23.08

Temika Ganae Gustus
Defendant

I have discussed this Statement of the Offense with my client, Temika Ganae Gustus. I concur with her decision to stipulate to this Statement of the Offense.

Date: 7/23/08

Frederick A. Douglas, Esquire
Curtis A. Boykin, Esquire
Counsel for Defendant Gustus